# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-2199

_____

Bryce Masters

*Plaintiff - Appellee*

v.

City of Independence, Missouri; Tom Dailey; Bryce Blackmore

*Defendant*s

Timothy Runnels

*Defendant - Appellant*

TASER International, Inc.; Patrick Smith

*Defendant*s

_____

No. 19-2242

_____

Bryce Masters

*Plaintiff - Appellant*

v.

City of Independence, Missouri; Tom Dailey; Bryce Blackmore

*Defendant*s

Timothy Runnels

*Defendant - Appellee*

TASER International, Inc.; Patrick Smith

*Defendant*s
_____

Appeals from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: November 19, 2020
Filed: May 27, 2021
_____

Before COLLOTON, MELLOY, and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

Bryce Masters brought this civil rights action pursuant to 42 U.S.C. § 1983, alleging that Independence, Missouri police officer Timothy Runnels used excessive force against him during a traffic stop.[1]  A jury found in favor of Masters and awarded him compensatory and punitive damages.  Runnels appeals, arguing that the district court erred in denying (1) his motion for judgment as a matter of law based on qualified immunity and (2) his motion for a new trial based on the admission of testimony by two of Masters's expert witnesses.  Masters cross-appeals, arguing that the district court erred in granting Runnels's request for a remittitur of a punitive

_____

[1]Masters sued other defendants in addition to Runnels, all of whom were dismissed from the case over the course of the proceedings.  Only the claims against Runnels are at issue on appeal.

-2-

damages award. Having jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part.

## I.

In the afternoon of September 14, 2014, Bryce Masters, then a 17-year-old high school senior, was driving his car on a residential street in Independence, Missouri.[2] Timothy Runnels, a police officer with seven years' experience in law enforcement, was on patrol in the area. He ran a license plate check on Masters's car, which revealed an outstanding warrant apparently associated with the plate.[3] Runnels then initiated a traffic stop.

After both cars stopped on the side of the road, Runnels approached Masters's front passenger-side window and asked Masters to roll it down. Although the window was fully operable, Masters did not roll it down completely. Runnels then walked around to the opposite side of the car, opened the front driver-side door, and ordered that Masters get out of the car. Masters refused, asking, "For what?" and whether he was under arrest. Runnels told Masters he was under arrest, but he did not explain the reason. During the encounter, Runnels never told Masters why he had

---

[2]These facts are based on the parties' joint stipulation of facts, two video recordings of the incident (from the onboard dash camera of Runnels's police car and the camera on Masters's cell phone), and evidence introduced at trial. We consider the evidence "in the light most favorable to the verdict, giving [Masters] the benefit of all reasonable inferences." Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co., 381 F.3d 811, 818 (8th Cir. 2004).

[3]The outstanding warrant was erroneously associated with Masters's license plate through a clerical error. The warrant was actually associated with a different license plate registered to an unrelated 39-year-old woman who had failed to appear in traffic court.

-3-

been pulled over, and he never asked for Masters's driver's license, vehicle registration, or proof of insurance.

Runnels drew his model X26 Taser,[4] which was in probe mode, and asked, "Do you really wanna get Tased right here in the middle of your car?" Masters resisted by leaning back onto the passenger-side front seat, saying, "I haven't done anything officer." Runnels re-holstered his Taser then attempted to physically remove Masters from the car by pulling on his shirt and legs. Masters temporarily succeeded in resisting Runnels by pulling away from him, but at no point during the encounter did Masters attempt to hit or kick Runnels nor did he verbally threaten him. After several

---

[4]According to the parties' stipulation, an X26 Taser is classified as a "less lethal" weapon used by law enforcement that may be operated in two modes: "probe mode" and "drive stun mode." In probe mode, two barbed darts shoot from the cartridge at the front of the weapon when a user pulls its trigger. If both darts make adequate contact with a target, an electrical circuit is completed and the X26 discharges short, rapid pulses of electrical current that radiate between the darts, causing muscle contractions intended to temporarily and safely incapacitate that person. The length of the electric shock varies depending on how the X26 is used. If the user fires the X26 and immediately releases the trigger, the target will be shocked in a five-second "cycle." The user can cut that cycle short by engaging the X26's safety before the five seconds elapse. The user can also initiate a new five-second cycle by pulling the trigger again after the first cycle ends. Alternatively, the user can continuously shock the target for consecutive five-second cycles by holding down the trigger. Before the encounter with Masters, Runnels received training on how to use the Taser to reduce the risk of inducing cardiac arrest. Specifically, he was trained to avoid (1) targeting an individual's chest with a Taser and (2) prolonging Taser discharges. Additionally, Runnels knew that he could stop the Taser from discharging continuously by engaging the safety or releasing the trigger.

The X26 user can also operate the Taser in drive stun mode by removing the cartridge from the front of the weapon. Doing so exposes two electrodes, which become energized when the user pulls the trigger and cause a painful burning sensation when applied to a target. Drive stun mode is solely intended to coerce an individual into compliance through the application of pain.

-4-

seconds, Runnels again drew his Taser and pointed it at Masters. He said, "All right, fine, f*** it. Just get out. Out, out right now," and he pulled the trigger.

One Taser probe lodged in Masters's chest while the other lodged in his abdomen, and the Taser began to shock Masters. Masters was nevertheless able to move, get out of the car, and lie face-down on the asphalt, where he fell unconscious. Runnels knelt down, released the trigger, and handcuffed Masters's hands behind his back. Runnels kept the Taser trigger engaged from the time he initially fired the Taser until he knelt down to handcuff Masters. The parties agree that the continuous Taser discharge lasted at least 20 seconds, the equivalent of four cycles of the Taser. During the Taser discharge, Masters complied with all of Runnels's commands until he fell unconscious.

After handcuffing him, Runnels lifted Masters, who was still unconscious, by his arms and dragged him several feet around the rear of the car to a driveway on the edge of the road. Runnels dropped Masters face-first onto the concrete, fracturing four teeth and causing abrasions to Masters's forehead as well as a laceration on his chin. In addition, the Taser discharge had disrupted Masters's heart beat, causing Masters to suffer a convulsion due to a lack of oxygenated blood flowing to his brain 34 seconds after Runnels fired the Taser. One minute and 41 seconds later, Masters fell into cardiac arrest. Emergency medical responders were able to resuscitate Masters, but he suffered hypoxia and anoxic brain injury as a result of his cardiac arrest.

Runnels was subsequently terminated from the Independence Police Department because of this incident and, after an FBI investigation, was indicted on two counts of deprivation of rights under color of law (one for the prolonged use of the Taser and one for dropping Masters to the ground) and two counts of obstruction of justice. On September 11, 2015, Runnels pleaded guilty to the deprivation of rights count related to the drop, the remaining counts were dismissed, and he was

-5-

sentenced to 48 months' imprisonment. Judgment in a Criminal Case, <u>United States v. Runnels</u>, No. 15-cr-00106-DW, at Doc. 44 (W.D. Mo. June 1, 2016).

On September 26, 2016, Masters sued Runnels under 42 U.S.C. § 1983 for violating his civil rights. As relevant to this appeal, Masters initially claimed that Runnels violated his Fourth Amendment right against the use of excessive force by (1) firing a Taser into Masters's chest, (2) prolonging the Taser discharge (the prolonged Taser claim), and (3) picking Masters up after he was rendered unresponsive and dropping him face-first onto concrete (the drop claim).

At the close of discovery, Runnels moved for summary judgment, arguing he was entitled to qualified immunity on Masters's two Taser-related claims. The district court denied the motion. Before trial, Runnels moved to exclude the expert testimony of, among others, Michael Dreiling, a vocational rehabilitation expert, and Dr. Karen Tabak, an economics expert. After a <u>Daubert</u> hearing on November 27, 2018, the district court denied Runnels's motion.

On December 10, 2018, a five-day jury trial commenced. At the close of Masters's evidence, Runnels moved for judgment as a matter of law, again arguing that he was entitled to qualified immunity for Masters's first two claims. The district court denied the motion. Runnels renewed the motion at the close of all evidence, and the district court again denied it.

On December 13, Masters submitted only the second and third claims—the prolonged Taser claim and the drop claim—to the jury. On December 14, the jury found in favor of Masters on both claims, awarding Masters $5,000,000[5] in compensatory damages for the prolonged Taser claim and $50,000 in compensatory

---

[5]The district court later reduced the compensatory damages award for the prolonged Taser claim to $2,900,000 to account for two payments that resulted in a $2,100,000 credit against the initial $5,000,000 award.

Appellate Case: 19-2199    Page: 6    Date Filed: 05/27/2021 Entry ID: 5039693

damages for the drop claim. The jury also awarded punitive damages on both claims—$500,000 for the prolonged Taser claim and $1,000,000 for the drop claim.

Runnels filed three post-trial motions. First, he renewed his motion for judgment as a matter of law on the prolonged Taser claim on the ground of qualified immunity. Second, he filed a motion for a new trial, arguing that the district court erred by, among other things, admitting the expert testimony of Dreiling and Dr. Tabak. Third, he filed a motion to alter or amend the judgment by remittitur, arguing that the jury's $1,000,000 punitive damages award for the drop claim was grossly excessive. On May 7, 2019, the district court denied Runnels's motions for judgment as a matter of law and a new trial but granted his motion for remittitur, decreasing the punitive damages award for the drop claim to $236,500.[6] This appeal and cross-appeal followed.

## II.

First, Runnels appeals the denial of his post-verdict motion for judgment as a matter of law, arguing that he is entitled to qualified immunity for Masters's prolonged Taser claim. We review a district court's denial of judgment as a matter of law on the basis of qualified immunity de novo, using the same standards as the district court. See Luckert v. Dodge Cnty., 684 F.3d 808, 816 (8th Cir. 2012). "A motion for judgment as a matter of law is proper only if 'a reasonable jury would not

---

[6]As part of its order, the district court credited $2,700 against the compensatory damages award for the drop claim to account for the restitution payment Runnels made in connection with his conviction based on the same conduct. This reduced the amount of compensatory damages Masters would receive on the drop claim to $47,300. When the district court granted remittitur, it did so by reducing the punitive damages award to a 5:1 ratio, using $47,300 as the amount of the compensatory damages award. Neither party asserts error in the district court's decision to rely on the reduced amount of compensatory damages to calculate the reduced punitive damages award.

-7-

have a legally sufficient evidentiary basis to find for [Masters].'" Id. at 817 (quoting Fed. R. Civ. P. 50(a)). Our review is "highly deferential to the jury verdict," id., and we must draw all reasonable inferences in favor of Masters "without making credibility assessments or weighing the evidence," Dean v. Cnty. of Gage, 807 F.3d 931, 936 (8th Cir. 2015) (quoting Phillips v. Collings, 256 F.3d 843, 847 (8th Cir. 2001)).

"Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." De Boise v. Taser Int'l, Inc., 760 F.3d 892, 896 (8th Cir. 2014) (quoting Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Blazek v. City of Iowa City, 761 F.3d 920, 922 (8th Cir. 2014) (quoting Stanton v. Sims, 571 U.S. 3, 6 (2013) (per curiam)). We conduct a two-part inquiry to determine whether qualified immunity protects a government official from liability: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Brown, 574 F.3d at 496.

We start with whether the evidence makes out a constitutional violation, specifically whether Runnels's prolonged use of the Taser amounted to an excessive use of force. To answer this question, we look to "whether the amount of force used was objectively reasonable under the particular circumstances." Shekleton v. Eichenberger, 677 F.3d 361, 366 (8th Cir. 2012) (quoting Johnson v. Carroll, 658 F.3d 819, 824 (8th Cir. 2011)). "We evaluate the reasonableness of an officer's use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Brown, 574 F.3d at 496 (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). Looking to the totality of the circumstances, we consider

-8-

(1) "the severity of the crime at issue," (2) "the immediate threat the suspect poses to the safety of the officer or others," and (3) "whether the suspect is actively resisting or attempting to evade arrest by flight." Shekleton, 677 F.3d at 366 (quoting Smith v. Kan. City, Mo. Police Dep't, 586 F.3d 576, 581 (8th Cir. 2009)). "Force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." Id. (internal quotation omitted).

Although we give some consideration to the circumstances in which Runnels initially discharged the Taser, Master's excessive force claim focuses solely on Runnels's prolonged use of his Taser, or the last 15 seconds of its deployment.[7] See Jackson v. Stair, 944 F.3d 704, 712 (8th Cir. 2019) (finding error where the district court did not analyze the second discharge of a Taser, which nearly instantaneously followed the initial discharge without warning, as a separate use of force); cf. Smith v. Conway Cnty., 759 F.3d 853, 860–61 (8th Cir. 2014) (analyzing under the Eighth Amendment the constitutionality of the second tasing of a non-violent, no longer aggressive inmate attempting to comply with prison guards' orders separately from the initial discharge of a Taser).

Viewing the facts in the light most favorable to the verdict, Runnels's prolonged use of his Taser was not an objectively reasonable use of force. Masters's conduct leading up to the tasing "did not amount to a severe or violent crime." Brown, 574 F.3d at 496. And although Masters initially resisted Runnels's attempts

---

[7]At trial, the court gave the gave the following instruction to the jury: "If you find that defendant Timothy Runnels had a reasonable belief that plaintiff Bryce Masters was actively resisting arrest as the taser was discharged, that plaintiff was failing to comply, or defendant Runnels continued the taser discharge unintentionally, your verdict must be in favor of defendant Timothy Runnels." As Runnels conceded at oral argument, by rendering its verdict in favor of Masters, the jury found that Runnels did not have a reasonable belief that Masters was actively resisting arrest during the last 15 seconds of the continuous 20-second Taser discharge.

-9-

to remove him from the car, he did not physically hit or verbally threaten Runnels. Masters, who was 17 years old at the time, "posed at most a minimal safety threat" to Runnels. Id. at 497. Moreover, any slight safety threat he might have posed dissipated during the last 15 seconds of the continual tasing when he was not resisting but in fact was complying with Runnels's commands, getting out of his car, and laying down on the pavement. In sum, Masters "was an unarmed suspected misdemeanant, who [was] not resist[ing] arrest, did not threaten [Runnels], did not attempt to run from him, and did not behave aggressively towards him." Shekleton, 677 F.3d at 366. A reasonable officer would not have continued to tase Masters under these circumstances. See Goodwin v. City of Painesville, 781 F.3d 314, 324–25 (6th Cir. 2015) (finding a Fourth Amendment violation where police officers continuously tased the plaintiff in probe mode for 21 seconds, during which he "was convulsing uncontrollably and had ceased all resistance"); Jones v. Las Vegas Metro. Police Dep't, 873 F.3d 1123, 1130–31 (9th Cir. 2017) (finding a triable issue of fact as to whether police officers violated the plaintiff's Fourth Amendment rights where they continued to tase him while he lay "on the ground after his body 'locked up' as a result of repeated taser shocks"); Glasscox v. City of Argo, 903 F.3d 1207, 1214 (11th Cir. 2018) ("Even if the arrestee's resistance justified deployment of a taser initially, if he has stopped resisting during this time period, further taser deployments are excessive." (cleaned up)). "[E]ven previously-resisting suspects have a constitutional right to be free of a gratuitous application of a Taser once they have stopped all resistance." Goodwin, 781 F.3d at 324.

Runnels nevertheless argues that this was a "tense and rapidly evolving" encounter. In his view, it was reasonable to continue discharging the Taser, even while Masters was compliant, until Masters was fully subdued. It is true that the reasonableness of an officer's use of force must take into account that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397. "Even so, a reasonable officer is not

-10-

permitted to ignore changing circumstances." Neal v. Ficcadenti, 895 F.3d 576, 581 (8th Cir. 2018). The undisputed evidence shows that Masters stopped resisting arrest soon after Runnels initially discharged his Taser. A reasonable officer would have taken into account those changed circumstances to determine whether continued or additional use of the Taser was warranted. Runnels did not do so, and the record supports Masters's claim that Runnels used excessive force when prolonging the use of the Taser.

Second, we consider whether the right to be free from an excessive, prolonged use of a Taser was clearly established as of September 14, 2014, when the traffic stop occurred. See Shekleton, 677 F.3d at 366 ("When determining whether an action was a clearly established constitutional violation, we look to the state of the law at the time of the incident."). "For a right to be clearly established, 'existing law must have placed the constitutionality of the officer's conduct beyond debate.'" Bell v. Neukirch, 979 F.3d 594, 606 (8th Cir. 2020) (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)). The law must have been clear enough at the time of the officer's conduct "that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." Id. at 606–07 (quoting Wesby, 138 S. Ct. at 590). "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Brown, 574 F.3d at 499 (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)).

In September 2014, it was clearly established that prolonging the use of a Taser against a suspect who was complying with a police officer's commands constituted an excessive use of force. See Jackson, 944 F.3d at 713. In Jackson, we held that it was clearly established as of 2013 that tasing an individual—who had fallen to the ground after being initially tased for five seconds—a second time without warning or time to affirmatively comply with the officer's commands was excessive force. See id. at 711–13. This was the case even though Jackson was initially tased for actively threatening a police officer by "rais[ing] his right fist toward the officer's

-11-

head." Id. at 708. Thus, by 2013, our case law had sufficiently established that tasing a "non-threatening, non-fleeing, non-resisting" misdemeanant was excessive, regardless of his or her earlier conduct that precipitated the initial use of force. See id. at 713 (citing Brown, 574 F.3d at 496–97; then citing Shannon v. Koehler, 616 F.3d 855, 862–63 (8th Cir. 2010); and then citing Montoya v. City of Flandreau, 669 F.3d 867, 871–72 (8th Cir. 2012)). Even though Jackson actively resisted arrest, we held that it would have been sufficiently clear to a reasonable officer that tasing him a second time while he was incapacitated from the first Taser discharge violated his constitutional right to be free from excessive force.

Runnels argues this case is distinguishable because the officer in Jackson "delivered a second taser application while the suspect was prone on the ground under the effects of the taser, clearly no longer resisting arrest." Yet that is effectively what happened here—Runnels continued to deploy his Taser after Masters was clearly no longer resisting arrest. Runnels also asserts there is "no bright line" on how long an officer may tase a suspect. But there is: An officer may not continue to tase a person who is no longer resisting, threatening, or fleeing. That is so whether the tasing comes in the form of multiple, separate deployments or, as in this case, a single, continuous deployment that lasts for an extended period of time. By September 2014, "when the tasing[] of [Masters] occurred, there was sufficient case law to establish that a misdemeanor suspect in [Masters's] position at the time of the [prolonged] tasing—non-threatening, non-fleeing, non-resisting—had a clearly established right to be free from excessive force," Jackson, 944 F.3d at 713, and that prolonged tasing of such a suspect was excessive.

The district court did not err in denying Runnels's motion for judgment as a matter of law on Masters's prolonged Taser claim.

-12-

III.

Runnels next appeals the district court's denial of his motion for a new trial on the grounds that the testimony of Dreiling, Masters's vocational rehabilitation expert, and Dr. Tabak, Masters's economics expert, should have been excluded. We review the district court's decision regarding the admissibility of expert witness testimony for an abuse of discretion. See In re Wholesale Grocery Prods. Antitrust Litig., 946 F.3d 995, 1000 (8th Cir. 2019). We will not reverse the district court's determination on the admissibility of expert testimony "[a]bsent a clear and prejudicial abuse of discretion." In re Prempro Prods. Liab. Litig., 586 F.3d 547, 565 (8th Cir. 2009); see also Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence . . . is ground for granting a new trial . . . .").

Trial judges serve a "gatekeeping" function and have "considerable leeway" in admitting or excluding evidence, including expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). Under the Federal Rules of Evidence,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. We have recognized that the "cases are legion that . . . call for the liberal admission of expert testimony," Johnson v. Mead Johnson & Co., 754 F.3d 557, 562 (8th Cir. 2014), and "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility," Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 758 (8th Cir. 2006). Nevertheless, "[e]xpert testimony is

-13-

inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." Wholesale Grocery, 946 F.3d at 1001.

Runnels asserts that Dreiling's vocational rehabilitation expert testimony was inadmissible because it was not supported by sufficient medical facts or data. "A vocational rehabilitationist assesses the extent of an individual's disability, evaluates how the disability affects the individual's employment opportunities, and assists the individual's re-entry into the labor market." Elcock v. Kmart Corp., 233 F.3d 734, 740 (3d Cir. 2000). Because vocational rehabilitationists generally are not physicians, they are not competent to diagnose a person's medical condition or to opine on their physical or psychological impairments. See Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996). They may, however, rely on medical records, reports, and testimony about a person's medical condition, combined with other materials and their knowledge and experience about the labor market, to opine on the effect the medical condition may have on that person's vocational outlook. See id.

In reaching his expert opinion, Dreiling relied upon medical records from the time Masters was initially treated for his injuries, neuropsychological testing performed by Dr. Terrie Price, an independent interview with Masters about his perspective on his injuries, Masters's educational records and employment history, and Dreiling's own education, training, and experience as a vocational rehabilitation consultant. Based on the information contained in these materials, he opined that, due to Masters's anoxic brain injury and related behavioral and cognitive difficulties caused by the tasing, Masters would likely be unable to successfully complete college or obtain a job that could adequately accommodate his physical and emotional needs. Because of this, Dreiling further reasoned that Masters has a diminished future earning capacity compared to his estimated earning capacity before the tasing.

Runnels nevertheless argues that such an opinion is speculative and unsup-ported by facts because none of Masters's medical experts directly testified that

-14-

Masters's brain injury "would impact him vocationally in any way, shape, form, or fashion." By his reading, the medical records and reports did not establish that Masters could not complete college or perform certain work-related tasks, would have a shortened work life, or would need any special or particular accommodations for work. Instead, he continues, experts like Dr. Price testified that Masters was of above average intelligence and could enroll in and complete college with certain accommodations.

Based on our review of the record, we disagree; there was sufficient undisputed evidence in the record to permit Dreiling to reach an independent vocational rehabilitationist opinion that Masters will have a diminished earning capacity going forward because of his medical, behavioral, and cognitive injuries. Although Dr. Price, when asked on cross-examination, said that she did not believe Masters was wholly incapable of attending college, she expressly conditioned that view by noting that Masters's cognitive and behavioral difficulties would "be limiting in his pursuit of goals." Namely, she identified that Masters's cognitive ability (*e.g.*, executive functioning, processing speed, memory, complex reasoning) and behavior (*e.g.*, frustration tolerance, attention span) were negatively affected by his anoxic brain injury and would require accommodations if Masters chose to pursue college. For example, in 2014, soon after the tasing, she observed that Masters reported slower thinking, headaches, visual problems, forgetfulness, mood swings, judgment issues, and trouble sleeping. And in 2015, when she reassessed Masters, she observed a worsening of some symptoms, including that he exhibited severe depression and anxiety.

Separately, during an interview with Dreiling as part of his vocational rehabilitation assessment, Masters confirmed that he had been dealing with ongoing difficulties since his anoxic brain injury relating to loss of short-term memory, difficulty multi-tasking, fatigue, anxiety, depression, and irritability. Moreover,

-15-

Masters explained that he felt incapable of pursuing college-level coursework because of his injuries and related cognitive and behavioral challenges.

Based on all of the above, as well as his experience working with people exhibiting similar challenges, Dreiling concluded that Masters will "have a lot of difficulty with pursuing a college education and being successful and using that education and training in the labor market." Rather than offering an unfounded medical opinion diagnosing Masters's symptoms, Dreiling relied upon medical reports and his own observations to conclude that Masters's cognitive and behavioral challenges would make attending college or obtaining and maintaining employment more difficult. Such an opinion falls within Dreiling's experience and expertise as a vocational rehabilitationist and was not contrary to the medical evidence. To the extent Runnels disagreed with the underlying medical opinions about the scope of Masters's injuries and related difficulties, he was free to challenge them through cross-examination at trial, which he did. See Hose v. Chi. Nw. Transp. Co., 70 F.3d 968, 974 (8th Cir. 1995) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." (quoting Loudermill v. Dow Chem. Co., 863 F.2d 566, 570 (8th Cir. 1988))). The district court did not abuse its discretion by admitting Dreiling's expert testimony.

Runnels also argues that the expert testimony of Dr. Tabak, an economist who opined on the present-day value of Masters's diminished future earning capacity, was inadmissible solely because it relied on Dreiling's vocational rehabilitation expert opinion. Because we conclude that Dreiling's expert opinion was properly admitted into evidence, we find no abuse of discretion in the district court's decision to admit Dr. Tabak's expert testimony.

Appellate Case: 19-2199    Page: 16    Date Filed: 05/27/2021 Entry ID: 5039693

## IV.

Masters cross-appeals, asserting the district court erred in granting a remittitur of the jury's punitive damages award on the drop claim from $1,000,000 to $236,500. Punitive damages are imposed to further legitimate interests in "punishing unlawful conduct and deterring its repetition." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568 (1996). An award of punitive damages that is "grossly excessive" in relation to those interests, however, "enter[s] the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." Id.; see also State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 417 (2003) (noting that grossly excessive punitive damages contravene "[e]lementary notions of fairness enshrined in our constitutional jurisprudence . . . that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose" (quoting Gore, 517 U.S. at 574 (Breyer, J., concurring))). We review the constitutionality of an award of punitive damages de novo, Ondrisek v. Hoffman, 698 F.3d 1020, 1028 (8th Cir. 2012), and we also review the proportionality determination de novo, Quigley v. Winter, 598 F.3d 938, 953 (8th Cir. 2010) (citing Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 435 (2001)).

To determine whether a punitive damages award is grossly excessive, we consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." Campbell, 538 U.S. at 418 (citing Gore, 517 U.S. at 575).

Reprehensibility is the "most important indicium of the reasonableness of a punitive damages award." Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594, 602 (8th Cir. 2005) (citing Campbell, 538 U.S. at 419). To assess the reprehensibility of the defendant's conduct, we consider whether:

Appellate Case: 19-2199    Page: 17    Date Filed: 05/27/2021 Entry ID: 5039693

[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability;[8] [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Ondrisek, 698 F.3d at 1028 (quoting Campbell, 538 U.S. at 419).

Looking to these factors, we agree with the district court that Runnels's actions dropping an unconscious Masters face-first onto concrete were reprehensible. The drop fractured several of Masters's teeth and injured his face and chin, exhibiting at the very least an indifference to Masters's health and safety—especially given his vulnerability at that moment. Indeed, Runnels could have just as easily lowered the then-unconscious Masters to the ground or placed him in the grass mere steps away. And although the drop was an isolated incident, it reflected a callousness to Masters's well-being that supports the conclusion that Runnels was acting with intentional malice. Such a reprehensible act may justify a large punitive damages award.

Next, we consider the ratio between the punitive and compensatory damages awarded, keeping in mind that "[p]unitive damages must bear a reasonable relationship to compensatory damages." Quigley, 598 F.3d at 954 (cleaned up). The Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," Gore, 517 U.S. at 582, although it has also suggested that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," Campbell, 538 U.S. at 425. A higher ratio may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages," Gore, 517

---

[8]Because the harm caused to Masters was physical not economic, the third factor is inapplicable. See Lee ex rel. Lee v. Borders, 764 F.3d 966, 975 n.4 (8th Cir. 2014).

-18-

U.S. at 582; see also Bryant v. Jeffrey Sand Co., 919 F.3d 520, 528 (8th Cir. 2019) ("Punitive damages may withstand constitutional scrutiny when only nominal or a small amount of compensatory damages have been assigned, even though the ratio between the two will necessarily be large." (quoting JCB, Inc. v. Union Planters Bank, NA, 539 F.3d 862, 876 (8th Cir. 2008))), or "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine," Gore, 517 U.S. at 582. On the other hand, a lesser ratio may be appropriate "[w]hen compensatory damages are substantial." Campbell, 538 U.S. at 425; see id. at 426 (noting compensatory damages "already contain [some] punitive element").

Here, the jury's compensatory damages award of $47,300 is not a nominal amount, see, e.g., Quigley, 598 F.3d at 955 ($13,685 not a nominal amount); Wallace v. DTG Operations, Inc., 563 F.3d 357, 362 (8th Cir. 2009) ($30,000 not a nominal amount), and this is not a case where "the injury was hard to detect" or to put an economic value on. Contra Bryant, 919 F.3d at 528–29 (affirming 250,000:1 punitive damages ratio where jury awarded $1 in nominal damages); Haynes v. Stephenson, 588 F.3d 1152, 1158–59 (8th Cir. 2009) (affirming 2,500:1 punitive damages ratio where jury awarded $1 in nominal damages). Indeed, the jury heard evidence regarding the medical and dental costs to treat the damage to Masters's face and teeth as a result of the drop.

Finally, we compare the punitive damages award to the civil and criminal penalties available for comparable misconduct. See Quigley, 598 F.3d at 955. Masters directs us to the crime Runnels pleaded guilty to, deprivation of rights under color of law, 18 U.S.C. § 242, which carries a fine of up to $250,000, see id. §§ 3559(a)(3), 3571(b)(3). This amount gives us some impression of Congress's views on the seriousness of Runnels's misconduct, but it is less useful to determine the constitutional limits of the punitive damages award. See Campbell, 538 U.S. at 428 ("When used to determine the dollar amount of [a punitive damages] award, . . . [a] criminal penalty has less utility [than a civil penalty].").

-19-

Ultimately, we conclude that the district court correctly found the jury's initial punitive damages award was disproportionate, but we disagree that the reduced award of $236,500 "sufficiently reflects the reprehensibility of [Runnels's] conduct." Quigley, 598 F.3d at 955. "[E]xemplary damages imposed on a defendant should reflect 'the enormity of his offense,'" Gore, 517 U.S. at 575 (quoting Day v. Woodworth, 13 How. 363, 371 (1852)). An appropriate ratio of punitive damages to compensatory damages on the drop claim must take into account the gravity of Runnels's misconduct, as recognized by the jury, while remaining consistent with due process in light of the amount of the compensatory damages award. The task is not easy, but looking to Supreme Court cases on the issue as well as those from our own circuit for guidance, we conclude that a ratio of 9:1 "comports with due process, while achieving the statutory and regulatory goals of retribution and deterrence." Quigley, 598 F.3d at 956; see Campbell, 538 U.S. at 425.

V.

For the reasons stated above, we affirm the district court's judgment in all regards, except that the punitive damages award is reversed and remanded to the district court for entry of a judgment imposing $425,700 in punitive damages for the drop claim.

COLLOTON, Circuit Judge, concurring.

In my view, *Jackson v. Stair*, 944 F.3d 704 (8th Cir. 2019), was wrongly decided and should not be extended. *See Jackson v. Stair*, 953 F.3d 1052 (8th Cir. 2020) (opinion dissenting from denial of rehearing en banc). The case presented by Masters, however, is stronger than the claim in *Jackson*. Unlike *Jackson*, where a reasonable officer could have believed that the offender's "momentary post-tasered position on the ground" did not "justify considering it as a clearly punctuated interim of compliance" that made further use of a taser unreasonable, 944 F.3d at 714

-20-

(Wollman, J., dissenting), Masters was compliant for the last fifteen seconds of the disputed tasing and lying face-down on the pavement for most of that time. No reasonable officer could have believed that Masters was resisting during that period, or that continued application of a taser was reasonable under the circumstances, so the district court properly denied qualified immunity.

_____

Appellate Case: 19-2199     Page: 21     Date Filed: 05/27/2021 Entry ID: 5039693